**NEW ENGLAND ELECTRIC SYSTEM et al., Petitioners,**

v.

**SECURITIES AND EXCHANGE COMMISSION, Respondent.**

No. 6332.

United States Court of Appeals First Circuit.

Heard Jan. 6, 1965.

Decided June 4, 1965.

John R. Quarles, Boston, Mass., with whom Richard B. Dunn, Richard W. Southgate, John J. Glessner, III, and Ropes & Gray, Boston, Mass., were on brief, for petitioners.

David Ferber, Sol., with whom Philip A. Loomis, Jr., Gen. Counsel, Ellwood L. Englander, Asst. Gen. Counsel, Martin D. Newman, Atty., and Solomon Freedman, Director, Div. of Corporate Regulations, S. E. C., Washington, D. C., were on brief, for respondent.

Before ALDRICH, Chief Judge, and SWEENEY and WYZANSKI, District Judges.

ALDRICH, Chief Judge.

This is a petition seeking to review and set aside a divestment order of the Securities and Exchange Commission pursuant to section 11(b) (1) of the Public Utility Holding Company Act of 1935, 15 U.S.C. § 79k(b) (1), requiring the petitioner, New England Electric System (NEES) to dispose of its gas utility properties by terminating its relationship with its eight subsidiary gas companies. The ultimate question in the case, which the Commission resolved against NEES, was whether divestiture would cause the loss of "substantial economies" within the meaning of the cited section.

Briefly, NEES is a registered holding company controlling, at the time of the hearing, fourteen electric utility subsidiaries and eight gas subsidiaries, with some 824,000 retail electric customers in the states of New Hampshire, Massachusetts, Rhode Island and Connecticut, and some 237,000 retail gas customers in Massachusetts. Seventy-eight percent of its gas customers are also served by the electric companies. Except for certain peaks and emergencies the gas distributed is natural gas supplied by pipe line companies from the southern United States. The gas companies have separate offices and management, but their top officers are responsible to the top officials of NEES. There was a lengthy hearing before an examiner at which NEES sought to show that the cost of divestment to the electric system would be $804,000 annually, and to the gas system, if operated as a single unit after severance, $1,098,000.[1] The Commission held, *inter alia*, that the financial effect upon the electric system was not a relevant inquiry, but that if it was it was not significant. This we do not reach. It also held, which we do reach, that the claimed

---

1. NEES' actual figure was $1,165,000, but the Commission reduced this by $67,000 as a result of a "revised basis of payments" authorized by it. NEES does not presently dispute this adjustment, but points out that the reverse adjustment must be made to the estimated electric system losses.

financial consequences to the gas system were not substantial as it construed the statute, but that if they were they had not been adequately proven.

■ Basic to its decision, as the Commission recognized at the outset of its opinion, is the meaning of the Act and the standards which it imposed. Briefly, section 11(b) (1) required divestiture unless NEES could satisfy the provisos or exceptions [2] contained in sub-paragraphs, or clauses, (A), (B) and (C). Clauses (B) and (C) were admittedly met. Clause (A) reads as follows:

"(A) Each of such additional systems cannot be operated as an independent system without the loss of substantial economies which can be secured by the retention of control by such holding company of such system;"

Before considering whether the Commission's interpretation of this clause was correct we must determine what its interpretation was. At the beginning of its opinion the Commission stated that to prevent divestiture NEES must show,

"that the additional systems were integrated in nature and 'were so small that they were incapable of independent economic operation' and had a 'real economic need' for management together with the principal system. Congress was aware that some loss of economies would usually result from the separation of jointly controlled utility systems, but considered that continued joint management should be permitted only where separation would entail a loss of economies which would be substantial in the sense that they were important to the ability of the additional system to operate soundly." [Footnotes omitted.]

The Commission then quoted at length from a decision by the Court of Appeals for the District of Columbia,[3] from which it drew the conclusion that clause (A) required a "showing by clear and convincing evidence [4] that such additional system cannot be operated under separate ownership without the loss of economies so important as to cause a serious impairment of that system." Lastly, at the end of its opinion, the Commission concluded that on the record it was unable "to find that the gas companies could not be soundly and economically operated independently of NEES, even assuming the validity of * * * [its] estimates."

Thus the statutory phrase, "cannot be operated as an independent system without the loss of substantial economies,"

2. The Commission uses the word "exceptions," and criticizes NEES' word "provisos." NEES' distinction, as we read it, was in response to a heavy burden of proof which the Commission sought to attach to exceptions. See fn. 4, infra.

3. Engineers Public Service Co. v. S. E. C., 78 U.S.App.D.C. 199, 138 F.2d 936, 944 (1943). This case is extensively relied on in the Commission's opinion without noting that certiorari was granted, 322 U.S. 723, 64 S.Ct. 1273, 88 L.Ed. 1561 (1944), and the decision subsequently vacated as moot. 332 U.S. 788, 68 S.Ct. 96, 92 L.Ed. 370 (1947). (This omission is remedied in its brief.) We do not know whether the view of the majority, or the dissent of Judge Soper, which accords with ours, would have ultimately prevailed.

4. The Commission has been criticized before for using this phrase, the court allowing it to pass, however, on the ground that it meant no more than the fair preponderance of the evidence, the ordinary burden of proof. Philadelphia Co. v. S. E. C., 1949, 85 U.S.App.D.C. 327, 177 F.2d 720, 725. We do not agree. This phrase has a well recognized meaning, and is applied in special cases, such as fraud, Lackawanna Pants Mfg. Co. v. Wiseman, 6 Cir., 1943, 133 F.2d 482, 486, or mistake, Philippine Sugar Estates Devel. Co., Ltd. v. Government of Philippine Islands, 1918, 247 U.S. 385, 391, 38 S.Ct. 513, 62 L.Ed. 1177, as applied in Aetna Ins. Co. v. Paddock, 5 Cir., 1962, 301 F.2d 807, 811. The Commission is to be criticized for continuing to use this language, which by its tone suggests to laymen, as well as to lawyers, a heavy burden. We suspect, from other statements in its opinion, that it accurately revealed the Commission's approach. If so, in any future proceedings the Commission should readjust its receptivity as well as its phraseology.

was said to mean, "incapable of independent economic operation;" "important to the ability * * * to operate soundly;" "so important as to cause a serious impairment of that system;" and "could not be soundly and economically operated."

In Middle South Utilities, Inc., 35 S.E. C. 1, 11 (1953), its most recent decision cited in its opinion for the support of its interpretation, the Commission ordered a divestment because it had not been shown that it would "cause the serious economic impairment of the system *or* that the gas properties could not operate effectively and efficiently under separate ownership." (ital. suppl.) Since presumably the Commission did not intend to voice simultaneously two different standards we read the word "or" as introducing an explanation or equivalency. Essentially this second Middle South Utilities phrase is the sole standard that the Commission adopts in its brief before us.

Also may be noted the Commission's statement, in refutation of one of NEES' contentions, that "other independent gas utility companies in the state * * * nevertheless have been able to conduct their operations and, apparently, earn a fair return without the alleged advantages of common control with electric utilities by a holding company."

Taking the record as a whole we find its brief accurate, and that the Commission's interpretation is that a loss is not "substantial" unless it would render impossible "economical or efficient operation." [5]

As to the correctness of this interpretation we have not considered before the meaning of clause (A), and there is no uniformity of judicial view elsewhere. It is true that in North American Co. v. S. E. C., 1946, 327 U.S. 686, 696–697, 66 S.Ct. 785, 792, 90 L.Ed. 945, the court referred to section 11(b) (1) as permitting retention only of "relatively small [companies] * * * unable to operate economically under separate management without the loss of substantial economies * * *." This was a passing summary, and did not purport to be an exact characterization. The precise meaning was not relevant to the constitutional questions then under consideration, and even if the court's language is not considered ambiguous we do not take it as an attempt to resolve possibly intricate questions of construction. We turn, therefore, to other considerations.

■ Although we do not regard the legislative history as determinative, we begin there as the Commission makes much of it. Its principal reliance is upon the concluding remarks of Senator Wheeler on the floor after the bill had finally passed both branches. Senator Wheeler stated, *inter alia*, that the act permitted a holding company to retain more than one integrated system only when the additional systems " * * * were so small that they were incapable of independent economical operation." 79th Cong.Rec. 14479 (Aug. 24, 1935). We may note, at the outset, that only by a most generous interpretation is this statement part of the legislative history. Having come afterwards, it could not have affected the voting. The best reason for considering it as evidence of Congressional intent, see United States v. United Mine Workers, 1947, 330 U.S. 258, 279–280, 67 S.Ct. 677, 91 L.Ed. 884; Duplex Printing Press Co. v. Deering, 1921, 254 U.S. 443, 477, 41 S.Ct. 172, 65 L.Ed. 349; cf. State Wholesale Grocers v. Great Atlantic & Pacific Tea Co., D.C.N.D.Ill., 1957, 154 F.Supp. 471, 485, rev'd on other grounds, 7 Cir., 258 F.2d 831, cert. den. 358 U.S. 947, 79 S.Ct. 353, 3 L.Ed.2d 352, is accordingly

5. NEES suggests there is no practical difference between preventing economical operation and bankruptcy. The Commission does not address itself to this question. We assume it believes there to be a difference, but except to the extent suggested in fn. 7, infra, we cannot find from its opinion what the difference is, or, more important, what is the standard by which uneconomical operation is determined. The very serious problem which this would present we do not reach because we disagree with the Commission's basic interpretation.

absent.[6] Furthermore, coming from the leading Congressional advocate of strict separation, see, e. g., 79 Cong.Rec. 1525, Feb. 6, 1935; id., 4903 (radio address of April 2, 1935); id., 14470, Aug. 24, 1935 (remarks of Senator Norris), it would seem natural to regard it, at that stage of the proceedings, as a self-serving declaration. To the cynically minded it would seem to have been merely a post-contest attempt to raise the score, recapture what had been lost in the compromise with the House discussed infra, and to serve, just as is now being sought, to influence subsequent history. The best that should be said for Senator Wheeler's statement under these circumstances is that it is not to be given the weight to which it might have been entitled if made at another time.

The other pieces of legislative history related in the Commission's brief are a quotation from remarks by Representative O'Connor speaking "of 'a little power plant in Florida' or 'a little plant in Oklahoma' (79 Cong.Rec. 14168, Aug. 22, 1935)" and one from Representative Cooper, "who had opposed the motion, [and] had referred to systems retainable under Clause (A) as 'unprofitable companies * * * too weak to stand alone' (id. at 14165–14166)." Examination of Representative O'Connor's full statement rebuts the economic implication the Commission wishes us to attach to the word

"little." It is evident that the remarks were addressed to geographical aspects, the absentee landlordism condemned in Clause (B). It is true that Representative Cooper was speaking of Clause (A). But it seems apparent that as an opponent of the bill he was strategically engaged in blackening it. According to him the compromise was no compromise whatever, a position demonstrably unsound. His interpretation of particular clauses must be read in that light. National Labor Relations Board v. Fruit & Vegetable Packers & Warehousemen, Local 760, 1964, 377 U.S. 58, 66, 84 S.Ct. 1063, 12 L.Ed.2d 129.

A much more pertinent characterization of the phrase "substantial economies" is found in the statement of the House Managers attached to the conference report recommending passage of the compromise draft, that the retention of additional systems was to be permitted where there was a "real economic need." H.R.Rep.No.1903, 74th Cong., 1st Sess., 71. This language, however, is itself ambiguous. Obviously there would be a real economic need to prevent a loss that would preclude efficient or effective operation. But there could also be said to be a real economic need to avoid any truly sizable financial loss notwithstanding the utility's ability to absorb it and remain efficient in some absolute sense.[7] For rea-

---

**6.** See Hart and Sacks, The Legal Process: Basic Problems in the Making and Application of Law (tent. ed. 1958) 1285:

> "The views of individual members of the legislature as to the meaning of a statute which were not officially communicated to the legislature prior to its enactment are not competent to be considered in determining the meaning which ought to be attributed to the statute."

Nor could it have invited a presidential veto, since the President was a known advocate of a strong bill. See 79 Cong. Rec. 3425–26, 3469–70, March 12, 1935 (Message to Congress); id. at 9042, June 11, 1935 (letter to Senator Barkley and Senator Wheeler); id. at 14164, Aug. 22, 1935 (letter to Representative Rayburn).

**7.** We have already commented upon the Commission's failure to enunciate any standard beyond this broad generalization of economy or efficiency. See fn. 5, supra. Possibly its views are partly implied by the points made in its opinion when assuming that an annual loss of $1,098,000 had been adequately established. The first was that while this amount is larger, absolutely, than losses required to be accepted in any previous case, it is not larger relatively. Secondly, that the loss would be only 23.28% of gross income, and 29.94% of net income before federal income taxes. (The word "only" is ours.) Third, that there are "other independent gas utility companies in the state which nevertheless have been able to conduct their operations and, apparently, earn a fair return * * * and * * * compete

sons we now come to we believe the statute is to be given this more general meaning.

The declaration of legislative objectives is found in section 1(b). Subsection (1) thereof concerns improper accounting practices, capitalization, etc., that may injure investors. Subsection (2) refers to excessive charges and other effects of transactions among companies within a holding company system. It also, together with subsection (3), refers to impediments occasioned by the holding company device to state regulation. We quote in full the remaining subsections, which declare the public interest to be adversely affected,

> "(4) when the growth and extension of holding companies bears no relation to *economy of management and operation* or the integration and coordination of related operating properties; or

> "(5) when in any other respect there is *lack of economy of management and operation* of public-utility companies *or lack of efficiency and adequacy of service* rendered by such companies, or lack of effective public regulation, or lack of economies in the raising of capital." (ital. suppl.)

Pausing here we note in the italicized phrases two concepts, economy of management and operation, and efficiency (and adequacy) of service. The word "or" in clause (5) is clearly used in the disjunctive. This separate meaning is emphasized when we come to section 11 (b) (1) clauses (A) and (C), infra. It will be sufficient to note here, for both present and future purposes, that the Commission has taken the word "efficient" from this use in connection with service and joined it with the phrase "economy of management and operation," and has then built out of the combination the concept that until a loss of economy and efficiency is shown to be total there has been no loss of substantial economies under clause (A) within Congressional

concern. We may note, also, an omission which we take seriously, that on the sole occasion that the Commission quoted clause (4) it substituted asterisks for the phrase we have italicized, and, although the legislative meaning of economies is the specific matter under consideration, has never referred to it. Clause (5), likewise, is never mentioned.

The definitions of "integrated public-utility systems" are found in section 2(a) (29). Subsection (A) defines an integrated electric system as one which, *inter alia*, "may be economically operated as a single interconnected and coordinated system." Subsection (B) defines a gas system as where, *inter alia*, "substantial economies may be effectuated by being operated as a single coordinated system." During argument we inquired the reason for this difference. No suggestion was forthcoming. The only reason apparent to us is that in order for electric companies to constitute an integrated public utility system they must meet a technical requirement not applicable to gas companies seeking to qualify as an integrated system. Unlike gas companies, General Pub. Util. Corp., 1951, 32 S.E.C. 807, 834–35, electric companies must be "physically interconnected or capable of physical interconnection." Where this requirement is met, so that actual interchanges of power could be made to meet power requirements at different points in the system, it was enough for Congress that the system as a whole "may be economically operated as a single inter-connected and coordinated system." Assuming the other qualifications were met electric companies would not have to prove that system ownership would be cheaper than independent ownership, probably because this could safely be assumed where there would be a sharing of power.

Coming to section 11(b), the primary provision, subsection (1) requires that holding companies be restricted to a single integrated public utility system except when subclauses (A), (B) and (C)

effectively * * *." Finally, that it "would be entering the realm of specula-

tion at this time to assume that rate increases would ensue from severance."

are satisfied.  For clarity we quote in full.

"(A) Each of such additional systems cannot be operated as an independent system without the loss of substantial economies which can be secured by the retention of control by such holding company of such system;

"(B) All of such additional systems are located in one State, or in adjoining States, or in a contiguous foreign country; and

"(C) The continued combination of such systems under the control of such holding company is not so large (considering the state of the art and the area or region affected) as to impair the advantages of localized management, efficient operation, or the effectiveness of regulation."

These exceptions to section 11(b) (1) were added as a result of a compromise with the House.  The original Senate bill had flatly restricted holding companies to a single integrated system.  S. 2796, 74th Cong., 1st Sess. (1935).  The House sought to permit as many systems as were consistent with the public interest. See H.R.Rep.No.1318, 74th Cong., 1st Sess. 17 (1935).  The Commission's then chairman objected that this would be intolerably indefinite.  79 Cong.Rec. 10838 (July 9, 1935)  See also H.R.Rep.No. 1318, supra, at 45.  Clauses (A), (B) and

(C) were proposed as a compromise to establish "definite and concrete circumstances" where retention of more than one system would be allowed.  Statement of House Managers, supra, at 70.

■ It is basic to the Commission's position that the phrase "substantial economies which can be secured by the retention of control" in clause (A) is fundamentally different from "substantial economies [that] may be effectuated by being operated as a single coordinated system" in section 2(a) (29) (B).[8]  Such a contention, of course, is opposed to the common principle that the same words in different portions of an act are presumed to have the same meaning.  In this case they are exactly the same.[9]  To overcome the presumption calls for an affirmative showing.[10]

■ Furthermore, we find the Commission's interpretation of clause (A) opposed to the initial statement of the purposes of the Act, supra, the tenor of which was that holding companies had been found uneconomical to investors and to the public.  It is not inconsistent with this to say that systems which do not offend in this respect, or in the other respects defined in clauses (B) and (C), should be continued instead of broken up, and that occasioning a loss of impressive proven economies was not the Congressional purpose.  This was a business reorganization act designed to produce a

8. The Commission is committed to this, and expressly so recognizes in its brief, because it rejected certain important evidence offered by NEES solely on the ground that the eight gas companies were conceded to be "a single integrated system."  Since the Commission could not, either in good conscience or in law, accept as a concession a matter so fundamental, not only to the present proceedings, but for the future, if it were contrary to the fact, it stands that the Commission feels that saving $329,400 annually by integrating the eight gas companies is effectuating substantial economies under section (29) (B), but that $1,098,600 annually is not substantial economies under clause (A).

9. The Commission's brief goes to some length in emphasizing the word "loss"

in section 11(b) (1) (A).  Sections 2(a) (29) (B) and 11(b) (1) (A) are not incomparable because the former speaks in terms of effectuating and the latter in terms of losing.  The important comparison is the word "effectuated" in the one section and "secured" in the other.  Both relate directly to "substantial economies."

10. In a special effort to make this showing counsel argues that there is a policy in the Act against an electric utility system being combined with a gas system. The short answer to this is that neither the Act, nor the Commission itself, says so.  Since, however, counsel's argument is extensive we will reply in kind, but in order not to prolong this footnote we will do so in an appendix, infra.

healthier economic structure in a vital industry. It established what, in the opinion of Congress, accomplished the best overall conditions. At the same time, Congress remained receptive to what, in a particular instance and within the limits established by clauses (B) and (C), might be affirmatively shown to be a more economical arrangement. We hold that clause (A) called for a business judgment of what would be a significant loss, not for a finding of total loss of economy or efficiency. Louisiana Pub. Serv. Comm. v. S. E. C., 5 Cir., 1956, 235 F.2d 167, rev'd on jurisdictional grounds, 353 U.S. 368, 77 S.Ct. 855, 1 L.Ed.2d 897.

We are confirmed in this view by the fact that not only do clauses (B) and (C) contain additional conditions of retention, so that clause (A) need not be interpreted so as to cover the entire Congressional intent, but that these other clauses relate back fully to counterparts of the declarations of purpose made in section 1(b), and the attempts to effectuate those purposes through the definitions made in section 2(a) (29), supra. Clause (A) would do the same were it not for the special restricted meaning that the Commission seeks to give it. The Commission, in other words, has attached to "substantial economies" in this one particular place a special meaning that nothing in the Act points to, and which, in fact, destroys its symmetry.[11]

It might not be inappropriate to conclude with the quotation with which the Commission began a section of its brief. "As was stated [the brief says] in the report of the National Power Policy Committee: '[I]ntensification of econom-

ic power beyond the point of proved economies not only is susceptible of grave abuse but is a form of private socialism inimical to the functioning of democratic institutions and the welfare of a free people.' * * * H.Doc.No.137, 74th Cong., 1st Sess. 4 (1935), appended to S.Rep.No. 621, 74th Cong. 1st Sess." We cannot think that "proved economies," any more than "substantial economies," mean anything other than economies which in ordinary business parlance and by ordinary business standards are of a substantial nature, considering, of course, the size of the companies to which the economies relate.[12] Clearly that was what was meant elsewhere in the Act. If in clause (A) Congress meant, instead, "cannot be operated efficiently as an independent system" it could readily have done so not only more clearly, but in fewer words.

■ The Commission's only answer is "the policy of the Act." We think the policy of the Act is to be found in the whole Act, not in one part. NEES has the burden of proving that it falls within an exception. This is enough, without a forced reading into that exception of some special meaning.

We regret the length of this discussion. Since, however, we find the Act not only consistent, but entirely responsive to analysis, we feel such analysis called for in fairness to those persons, whether investors or consumers,[13] who must absorb perhaps a million dollars a year (quite apart from over $800,000 allegedly lost to the electric system) which the Commission feels insubstantial.

11. Drawing an equivalence between the proviso contained in clause (A) to section 11 and the corresponding requirements for an integrated gas system under section 2(a) (29) (B) nullifies no technical requirements in the definition of an integrated gas system because there are none. The definition of an integrated electric system under section 2(a) (29) (A) does contain some technical requirements, as has been pointed out, but these, also are not nullified by our interpretation of clause (A) since it remains stricter than section 2(a) (29)

(A)'s requirement that the electric system "may be economically operated."

12. In this case the claimed losses are over 23% of gross income. See fn. 7, supra.

13. The Commission's finding it significant that it was insufficiently shown that this loss would require an increase in rates "at this time," fn. 7, supra, not only disregards the fact that the cost of doing a utility business normally is passed on to consumers eventually, but the fact that one of the purposes of the Act was to benefit legitimate investors.

The Commission having applied the wrong standard, its decision must be reversed unless on the record there could have been no finding in NEES' favor on the appropriate standard. We think clearly there could have been. NEES' case was based essentially upon a study made for it by Ebasco Services, Inc., (Ebasco), a management consultant which the Commission found possessed extensive experience in the utilities field. No rebuttal evidence, other than some exhibits, was offered on behalf of the Commission, which grounded its rejection of the report, to the extent that it did reject it, solely on criticism of the report's conclusions in the light of NEES' evidence or its own expertise. Its specific criticisms, related to that portion of the report which dealt with certain costs totalling $472,100 or, more specifically, for the most part, customer and accounting costs included theren, for which the Ebasco estimate was $415,600. The first criticism concerned billing. The circumstances were these. Ebasco's original study was made on the assumption that the gas companies would be individually managed. On this hypothesis it naturally assumed that each company would conduct separate customer billing. When the Commission took the position that the gas companies constituted a single integrated system and should be sold as such, Ebasco was required to reduce its estimate by the amount attributable to operating the gas companies individually rather than as a unit. It made no reduction with respect to customer billing.

On this subject NEES called three witnesses. One Quig, a representative of Ebasco with ample qualifications, testified to certain accounting savings that could be effected if the gas companies were operated collectively rather than individually. He stated, however, that Ebasco would not recommend, at least at the outset, centralization of certain matters, including billing; that a continuing study might show that further centralization would prove useful, but that it was by no means clear that economy lay in that direction, and that it would depend on such factors as business growth, new developments in mechanization, etc. Subsequently one Dalbeck, the principal officer of NEES' gas division, testified that it was conceivable that centralized billing might be effected to some degree, but that in his opinion it was not really important cost-wise; that he had made many studies of customer accounting procedures and had never found any real economies in centralization of billing. Thereafter one Johnson, an Ebasco representative with particular experience in customer accounting, testified that a detailed study would have to be made, which Ebasco had not done; that based upon his experience he had considered centralized billing for the combined operation and had made the judgment that there would be no economy, or at least "any substantial savings." The witness was cross-examined at length and showed a wide knowledge not only of specialized mechanical equipment in this area and the problems involved, but also of the particular practices of a large number of named utilities in various parts of the country. He recognized that in many instances centralized billing prevailed, but continued to express doubts as to how much was saved thereby.

The Commission's response to this was to point out that some of the NEES gas companies presently combined their billing with the electric companies in their areas. This matter had been explained by NEES' witnesses, who pointed out, *inter alia*, the duplication of customers, which would not exist in the case of gas companies operating alone. The Commission concluded, however, that NEES had not "given any satisfactory reason why at least some form or forms of combined billing procedure could not be employed advantageously by the gas companies, in light of the fact that their aggregate of 237,000 customers is located in a relatively compact area."

We have serious doubts as to the extent that the Commission is entitled to disregard an opinion on a matter obviously requiring expert, specialized knowledge with no further evidence before it than

what had been considered by the accepted expert. Cf. United Shoe Mach. Corp. v. Industrial Shoe Mach. Corp., 1 Cir., 1964, 335 F.2d 577, 579, cert. den. 379 U.S. 990, 85 S.Ct. 702, 13 L.Ed.2d 610; Security-First National Bank v. Lutz, 9 Cir., 1963, 322 F.2d 348, 355; Alvary v. United States, 2 Cir., 1962, 302 F.2d 790, 794; Cullers v. Commissioner of Internal Revenue, 8 Cir., 1956, 237 F.2d 611, 616. This is not a matter on which a body having such broad jurisdiction as the Commission can have detailed expertise upon which to base affirmative findings. Compare Market St. Ry. v. Railroad Commission, 1945, 324 U.S. 548, 560, 65 S.Ct. 770, 89 L.Ed. 1171. Without finally passing upon this point, since the case must go back in any event, we suggest that on this record the maximum the Commission was warranted in inferring was that the difference in costs between separate and combined billing would not, if significant at all, constitute a sizable portion of the total added billing expense.

This brings us to what was the added billing expense, and hence the amount of error attributed to the Ebasco report because of its failure to assert the saving which, in the Commission's opinion, could be effected by having centralized billing. The Commission concluded merely that Ebasco's failure caused the estimate to be "overstated." It did not concern itself with discovering even what were the total increased billing costs, let alone the portion (obviously not the whole) which might be saved if centralized billing were adopted. It did find that the increased billing costs estimated for two of the eight gas companies, billing singly after divestiture, was $34,700 for the two. These companies covered more than half of NEES' gas customers. On a pro rata basis this would make the total billing increase for all companies $60,000. While doubtless such a projection is not precise, it seems significant that the Commission was not sufficiently interested to make any at all. Under the circumstances we do not think it unreasonable for us to point out that while the Commission was

purportedly criticizing a cost estimate of over $400,000, strictly it was speaking of perhaps $60,000, only a portion of which could have been overstated.

We might have more sympathy with some, but not all, of the Commission's criticism of certain other alleged accounting disparities. Frankly, we are not sufficiently versed, nor do we find the record sufficiently helpful, to permit our analyzing them in every detail. However, it has not been contended that, even cumulatively, they remove from the Ebasco $472,000 cost estimate many sizable items.

■ After discussing the above matters the Commission said,

"In view of respondent's burden of proof and the absence of a persuasive explanation on the record, Ebasco's failure to consider employment of combined billing procedures and its inadequately explained disparate treatment of certain effects of severance on the gas and electric companies, respective, substantially impair the credibility and preclude the acceptance of its estimate of a $472,100 increase in treasury and accounting costs and, in turn, of its over-all estimate of increased costs (of which that figure is a material part) in the determination of whether severance would result in a substantial loss of economies."

If this constitutes a finding that the deficiencies which the Commission believes it has found are so serious that the Commission was entitled to reject the balance of the report from that very fact, we cannot agree. The doctrine of *"falsus in uno, falsus in omnibus,"* so far as it has any value, ordinarily applies to cases of deliberate falsehood. See 3 Wigmore, Evidence § 1013 (3d ed. 1940). The Commission has not suggested, and we see no possible basis for suggesting, that the discrepancies it complains of indicate bias or dishonesty. Absent a finding that the errors found are related to, or infect, other matters not directly discredited, if the *"falsus in uno"* doctrine, or a corollary, is to be used on any further basis

to impeach an expert's report, it must be shown that the errors are so serious that that they indicate substantial carelessness, or otherwise impugn the expert's qualifications. See, e. g., Hoag v. Wright, 1903, 174 N.Y. 36, 43, 66 N.E. 579, 581, 63 L.R.A. 163. Again, the Commission made no such findings. If there was a ground for them it has not been suggested. Indeed, the Commission demonstrated its confidence in Ebasco elsewhere by accepting its cost estimate as the basis for concluding that the gas companies constitute an integrated system.

On the record there is a large, residual showing in the Ebasco report. Even at minimum it is $1,098,000 minus some fraction of $472,000. However, we do not think it presently appropriate for us to consider whether such minimum showing meets our interpretation of "substantial economies." We do state, however, that on remand the Commission must address itself to this problem by making specific findings, and not content itself with general conclusions. One illustration of this will suffice. The Commission states in its brief that it "had the right to consider competitive advantages of separation in offsetting alleged losses of economies." We do not question this. What we do question is the Commission's failure to find or articulate any specific or approximate financial benefit that such a change would occasion. Free competition, as the Act recognizes, is normally beneficial. It is not necessarily so, nor in any assumed amount. The various automotive divisions of General Motors seem to do very well. More close to home, the Massachusetts Department of Public Utilities, which voices no apparent criticism of a number of combined local gas and electric companies within the Commonwealth, affirmatively appeared in opposition to the Commission's proceeding in the present case. The Commission states that the Department's views have been "carefully considered," but it goes no further. If the Commission is of opinion that substantial gains will accrue to the gas system by placing it in competition with the electric companies rath-

er than, in part, under the same roof, specific findings should be made, and not just a general reference to the advantages of competition. This is particularly called for where the evidence shows that NEES has made a special effort to obtain for its gas system many of the benefits of independence.

Decree will be entered vacating the order of the Commission and remanding for further action not inconsistent herewith.

### APPENDIX

■ In the Commission's brief counsel argues that section 11(b) embodies a federal concern with use of the holding company form to combine a gas system with an electric system. There are several answers to this. In the first place, it is too specialized an approach. The meaning of this section and of sub-clauses (A), (B) and (C) must be the same whether the principal system and the additional systems are of like nature or are different. "Substantial economies," in other words, should have the same connotation in the one case as in the other.

Secondly, nowhere in the Act is there a condemnation of the retention of gas and electric systems, provided the tests contained in clauses (A), (B) and (C) are met. To the contrary, section 8 prohibits a holding company's acquisition of gas and electric utilities serving the same territory, where state law prohibits combined gas and electric operations, without express approval of the state commission. If anything, this is a negative pregnant, as the Commission has recognized and the legislative history makes clear. See Northern States Power Co., 1954, 36 S.E. C. 1, 8; S.Rep.No.621, 74th Cong., 1st Sess., 29–30; H.R.Rep.No.1318, supra, at 14–15; Report of National Power Policy Committee, H.R.Doc.No. 137, 74th Cong., 1st Sess. 10 (1935), appended to S.Rep. No. 621, supra, at 59; Hearings Before House Committee on Interstate and Foreign Commerce on H.R. 5423. 74th Cong., 1st Sess. 330 (1935) (statement of Rep. Rayburn). How far such an inference may be carried in the light of the fact that section 10(c). which pre-

scribes the standards for acquisitions, expressly incorporates the retention standards, and requires further that an acquisition tend toward the development of an integrated system, may be questioned. Cf. American Water Works & Elec. Co., 1937, 2 S.E.C. 972, 983 & n. 3; Columbia Gas & Elec. Corp., 1941, 8 S.E.C. 443, 462–63; American Gas & Elec. Co., 1946, 22 S.E.C. 808, 815. But at the least we find neither there nor elsewhere in the Act a general policy of opposition to gas and electric company joinder.

Nor, if the matter could be thought to be illuminated by administrative practice, has the Commission previously made such an interpretation, nor does it now. In its opinion the Commission stated, "We do not take the view that the Act expresses a federal policy against combined gas and electric operations as such." Counsel's attempt to explain this away by saying the Commission's phrase "as such" meant simply that the Commission was disclaiming interest when the interstate holding company form was not employed, attributes to the Commission the banality that it was not claiming jurisdiction in those cases where obviously it does not have it. We believe the Commission was saying something more than this, and that counsel, in the brief is merely seeking some new ground to support the Commission's result.