SECURITIES AND EXCHANGE COMMISSION *v.*
NEW ENGLAND ELECTRIC SYSTEM ET AL.

No. 636.  Argued March 23, 1966.—Decided May 16, 1966.

*Philip A. Loomis, Jr.,* argued the cause for petitioner. With him on the brief were *Solicitor General Marshall, David Ferber* and *Solomon Freedman.*

*John R. Quarles* argued the cause for respondents. With him on the brief were *Richard B. Dunn, Richard W. Southgate* and *John J. Glessner III.*

MR. JUSTICE DOUGLAS delivered the opinion of the Court.

New England Electric System (NEES) is a holding company registered under § 5 of the Public Utility Holding Company Act of 1935.[1] Its holdings include both electric and gas utility properties. The electric companies serve retail customers in New Hampshire, Massachusetts, Rhode Island, and Connecticut. The gas companies serve retail customers in Massachusetts alone.[2] The Commission, proceeding under § 11 of the Act,[3] held that the electric utility subsidiaries of NEES constituted an "integrated electric utility system" as defined in

---

[1] 49 Stat. 812, 15 U. S. C. § 79e (1964 ed.).

[2] NEES, the electric companies, and the gas companies are all parties respondent and are hereafter referred to as respondent.

[3] 49 Stat. 820, 15 U. S. C. § 79k (1964 ed.).

§ 2 (a)(29)(A).[4]   38 S. E. C. 193.   The question in this case does not concern these electric utility subsidiaries but only the gas utility subsidiaries of NEES, which both NEES and the Commission agree constitute an "integrated gas utility system" within the meaning of § 2 (a)(29)(B) of the Act.[5]

By § 11 (b)(1)[6] a holding company system is to be limited in operations by the Commission "to a single integrated public-utility system," [7] provided, however, that it may be permitted to control one or more addi-

---

[4] 49 Stat. 810, 15 U. S. C. § 79b (a)(29)(A) (1964 ed.).   An "integrated public-utility system" as applied to *electric utility companies* is defined by § 2 (a)(29)(A) as "a system consisting of one or more units of generating plants and/or transmission lines and/or distributing facilities, whose utility assets, whether owned by one or more electric utility companies, are physically interconnected or capable of physical interconnection and which under normal conditions may be economically operated as a single interconnected and coordinated system confined in its operations to a single area or region, in one or more States, not so large as to impair (considering the state of the art and the area or region affected) the advantages of localized management, efficient operation, and the effectiveness of regulation."

[5] 49 Stat. 810, 15 U. S. C. § 79b (a)(29)(B) (1964 ed.).   An "integrated public-utility system" as applied to *gas utility companies* is defined by § 2 (a)(29)(B) as "a system consisting of one or more gas utility companies which are so located and related that substantial economies may be effectuated by being operated as a single coordinated system confined in its operations to a single area or region, in one or more States, not so large as to impair (considering the state of the art and the area or region affected) the advantages of localized management, efficient operation, and the effectiveness of regulation."

[6] 49 Stat. 820, 15 U. S. C. § 79k (b)(1) (1964 ed.).

[7] The Commission has long held that a single "integrated public-utility system" cannot include both gas and electric properties. See *Columbia Gas & Electric Corp.*, 8 S. E. C. 443, 462–463; *The United Gas Improvement Co.*, 9 S. E. C. 52, 77–83; *Philadelphia Co.*, 28 S. E. C. 35, 44.   Respondent does not contest this aspect of the Commission's reading of the Act.

tional "integrated public-utility systems" if the Commission finds, *inter alia,* that "[e]ach of such additional systems cannot be operated as an independent system *without the loss of substantial economies* which can be secured by the retention of control by such holding company of such system." § 11 (b)(1)(A). (Italics supplied.) It is on the meaning of this proviso that the present controversy depends. The Commission found that divestment of NEES' gas utilities would not result in a "loss of substantial economies" to these companies within the meaning of § 11 (b)(1)(A). It construed Clause (A) to require a showing that the "additional system cannot be operated under separate ownership without the loss of economies so important as to cause a serious impairment of that system." The Commission ruled that it was unable "to find that the gas companies could not be soundly and economically operated independently of NEES." It found that any losses of economies would be offset by the benefits that would flow from the healthy competition between the independently controlled gas and electric companies, promotion of competition between gas utilities and electric utilities being an important purpose of the Act. Accordingly, it ordered that the gas utilities be divested.

On petition for review the Court of Appeals reversed on the ground that the Commission had misinterpreted the statutory phrase "loss of substantial economies." 346 F. 2d 399. The court held that Clause (A) "called for a business judgment of what would be a significant loss, not for a finding of total loss of economy or efficiency" (346 F. 2d, at 406), and, believing that on this record and with the statute so interpreted there could have been a finding in favor of NEES, remanded the case to the Commission. We granted certiorari, 382 U. S. 953.

We agree with the Commission's reading of Clause (A) and remand the cause to the Court of Appeals so that

there may be a review of the challenged order in light of the proper meaning of the statutory term.

The requirement in § 11 of a "single integrated" system is the "very heart" of the Act.[8] The retention of an "additional" integrated system is decidedly the exception.[9] As originally passed by the Senate, § 11 would have limited all registered holding companies to a single "geographically and economically integrated public-utility system." [10] The House version differed in that it permitted the Commission to make exceptions where limitation of the operations of the holding company was not found to be "in the public interest." [11] The version with which we deal emerged from a conference committee. The scope of the exception as it appears in the bill's final form was thus explained to the House:

> "Section 11 of both bills [*i. e.,* the House and Senate versions], therefore, authorizes the Securities and Exchange Commission to require a holding company to limit its control over operating utility companies to *one integrated public-utility system.*
>
> .    .    .    .    .
>
> "The conference substitute meets the House desire to provide for further flexibility by the statement of additional definite and concrete circumstances under which exception should be made to the form of one integrated system. . . .
>
> "The substitute, therefore, makes provision to meet the situation where a holding company *can*

---

[8] *North American Co.* v. *SEC,* 327 U. S. 686, 704, n. 14; S. Rep. No. 621, 74th Cong., 1st Sess., 11.

[9] *North American Co.* v. *SEC, supra,* at 696–697.

[10] S. 2796, § 11 (b), 74th Cong., 1st Sess. And see S. Rep. No. 621, 74th Cong., 1st Sess., 32.

[11] S. 2796, § 11 (b), as passed by the House of Representatives, and sent to the Senate on July 9, 1935. And see H. R. Rep. No. 1318, 74th Cong., 1st Sess., 17.

*show a real economic need* on the part of additional integrated systems for permitting the holding company to keep these additional systems . . . ." H. R. Rep. No. 1903, 74th Cong., 1st Sess., 70–71. (Italics supplied.)

Additional light is shed on the purpose of § 11 by the remarks of Senator Wheeler, a member of the conference committee:

"Since both bills accepted the proposition that a holding company should normally be limited to one integrated system, my colleagues and I conceived it to be our task to find what concrete exceptions, if any, could be made to this rule that would satisfy the demand of the House for some greater flexibility. After considerable discussion the Senate conferees concluded that the furthest concession they could make would be to permit the Commission to allow a holding company to control more than one integrated system if [among other tests] the additional systems were in the same region as the principal system and were so small that they were *incapable of independent economical operation* . . . ." 79 Cong. Rec. 14479. (Italics supplied.)

As the Commission said in 1948:

"The legislative history of Section 11 (b)(1) indicates that it was the intent of Congress to create only a limited exception to the general rule confining holding companies to a single system, and that this exception was created to deal with the situation in which the proven inability of the additional system to stand by itself would result in substantial hardship to investors and consumers were its relationship with the holding company terminated." *Philadelphia Co.*, 28 S. E. C. 35, 46.

While the Commission has variously phrased the rule, it has consistently adhered to that view.[12]

This suggests a much more stringent test than "a business judgment of what would be a significant loss," to quote the Court of Appeals. 346 F. 2d, at 406. Promotion of "economy of management and operation" and "the integration and coordination of *related* operating properties" (§ 1 (b)(4), 49 Stat. 804, 15 U. S. C. § 79a

---

[12] Respondent concedes that the Commission has, since 1948, "articulated" a test "like the present test." See *Philadelphia Co.*, 28 S. E. C. 35, 46–47, 53–74; *General Public Utilities Corp.*, 32 S. E. C. 807, 814–815, 826–827, 831; *Middle South Utilities, Inc.*, 35 S. E. C. 1, 11–13. Respondent contends, however, that previous decisions of the Commission applied a less restrictive standard of "substantial economies." The Commission disagrees, urging that while there was "some variation in choice of words," it has maintained a basically consistent position and that any semantic differences are due largely to "the varying contentions with which the Commission was dealing." The cases referred to are *North American Co.*, 11 S. E. C. 194, 208–213; *Engineers Public Service Co.*, 12 S. E. C. 41; *Cities Service Power & Light Co.*, 14 S. E. C. 28, 37; *Middle West Corp.*, 15 S. E. C. 309, 319; *Cities Service Co.*, 15 S. E. C. 962, 984; *American Gas & Electric Co.*, 21 S. E. C. 575, 596–597. We do not read those cases as being inconsistent with the Commission's position since 1948. In each of these cases the Commission found no showing of "substantial economies" under whatever test might be applied; thus it was not there compelled to go further. There are, to be sure, a few cases in which the Commission permitted retention of small additional systems on the ground that the requirements of § 11 (b)(1) were met; in these, however, the Commission did not articulate any standard. See, *e. g., Federal Light & Traction Co.*, 15 S. E. C. 675, 683; *Republic Service Corp.*, 23 S. E. C. 436, 451. But cf. *North American Co.*, 11 S. E. C. 194, 243–244.

We cannot say that these early decisions show any clear inconsistency with the standard which the Commission today applies, and has applied since 1948. Under these circumstances, we feel justified in regarding the Commission's reading of the statute as supported by consistent administrative practice.

(b)(4) (italics supplied)) is a theme that runs through-
out the Act. But so does the theme of elimination of "re-
straint of free and independent competition." [13]  § 1 (b)
(2), 49 Stat. 803–804, 15 U. S. C. § 79a (b)(2). One of
the evils that had resulted from control of utilities by
holding companies was the retention in one system of
both gas and electric properties and the favoring of one
of these competing forms of energy over the other.[14]

---

[13] Section 1 (b) provides ". . . [I]t is hereby declared that the
national public interest, the interest of investors in the securities of
holding companies and their subsidiary companies and affiliates, and
the interest of consumers of electric energy and natural and manufac-
tured gas, are or may be adversely affected . . . (2) when subsidiary
public-utility companies are subjected to excessive charges for serv-
ices, construction work, equipment, and materials, or enter into
transactions in which evils result from an absence of arm's-length
bargaining *or from restraint of free and independent competi-
tion; . . .*" (Italics supplied.)

[14] See S. Rep. No. 621, 74th Cong., 1st Sess., 29; Report of Na-
tional Power Policy Committee, H. R. Doc. No. 137, 74th Cong., 1st
Sess., 10 (Appendix to S. Rep. No. 621, 74th Cong., 1st Sess.).
Congress was well aware of the anti-competitive potential of
corporate structures through which control of gas and electric utility
companies rests under the umbrella of a single holding company.
That a holding company so situated might retard expansion of the
gas utility company in favor of the electric utility company was
expressly discussed in the Senate Hearings on an earlier version of
the Act. See Hearings before the Senate Committee on Interstate
Commerce on S. 1725, 74th Cong., 1st Sess., 783.
Congress made specific provision in § 8 of the Act to prohibit
a registered holding company from acquiring an interest in both
an electric and a gas utility serving the same territory in a State
which prohibits common control, without first obtaining permission
from the appropriate state regulatory agency. While § 8 reflects
the concern of Congress with this aspect of competition (see S. Rep.
No. 621, *supra,* at 29–30; Report of National Power Policy Com-
mittee, *supra,* at 10), there is no warrant for concluding that § 8
was the exclusive legislative effort relating to the problem. The
history of the Act reflects the presence of a sophisticated statu-

In the present case the Commission said on this phase of the controversy:

"Although the NEES Gas Division handles sales and promotional activities and various other matters for the gas subsidiaries separately from the electric companies, final authority on all important matters rests in the top NEES management. The basic competitive position that exists between gas and electric utility service within the same locality is affected by such vital management decisions as the amount of funds to be raised for or allocated to the expansion or promotion of each type of service." [15]

Competitive advantages to be gained by a separation are difficult to forecast. The gains to competition might

---

tory scheme. To some extent, local policy was expected to govern, with § 8 serving to prevent circumvention of that policy by use of the "extra-State device of a holding company." S. Rep. No. 621, *supra*, at 29–30. At the same time, § 11 was expected to assist in imposing restrictions with regard to the combination of gas and electricity in one system. Discussing the interplay between § 8 and § 11, the Senate Committee noted that § 8 only applied to future acquisitions: "The committee felt that while the *policy upon which this section was based was essential in the formulation of any Federal legislation* on utility holding companies, it did not think that the section should make it unlawful to retain (*up to the time that section 11 may require divestment*) interests in businesses in which the companies were lawfully engaged on the date of the enactment of the title." *Id.,* at 7. (Italics supplied.)

[15] By fostering competition between gas and electric utility companies, the Act promotes what has been described as "variegated competition." Hearings before the Subcommittee on Antitrust and Monopoly of the Senate Committee on the Judiciary, 89th Cong., 1st Sess., pt. 2, 840 (1965) (statement of Dr. Samuel M. Loescher). "But since the distribution of electricity, following geographical divorcements, was to remain a natural monopoly in every region, the only kind of competition to be enhanced was that of 'variegated competition.'" *Ibid.*

well be in the public interest and might well offset the estimated loss in economies of operation [16] resulting from a separation of the gas properties from the utility system. This is a matter for Commission *expertise* on the total competitive situation, not merely on a prediction whether, for example, a gas company in a holding company system may make more for investors than a gas company converted into an independent regime.

The phrase "without the loss of substantial economies" is admittedly not crystal clear. But the Commission's construction seems to us to be well within the permissible range given to those who are charged with the task of giving an intricate statutory scheme practical sense and application. *Power Reactor Co.* v. *Electricians,* 367 U. S. 396, 408. And see *Philadelphia Co.* v. *SEC,* 177 F. 2d 720, 725.

*Reversed and remanded.*

MR. JUSTICE HARLAN, whom MR. JUSTICE STEWART joins, dissenting.

The question before the Court is the meaning of the phrase "loss of substantial economies" as it appears in § 11 (b)(1) of the Public Utility Holding Company Act of 1935.[1]   The Court of Appeals ruled that the phrase

---

[16] See, *e. g.,* Hearings before House Committee on Interstate and Foreign Commerce on H. R. 5423, 74th Cong., 1st Sess., 1249, 1402–1403, 1530–1531, 2257–2277; Hearings before Senate Committee on Interstate Commerce on S. 1725, 74th Cong., 1st Sess., 65. It was only the loss of *"substantial* economies" that Congress thought would justify an exception from the separation rule of § 11.

[1] 49 Stat. 820, 15 U. S. C. § 79k (b)(1).   This subsection provides that a holding company shall be limited to "a single integrated public-utility system," provided that the Commission shall permit control of additional systems if:

"(A) Each of such additional systems cannot be operated as an independent system without the loss of substantial economies which

"called for a business judgment of what would be a significant loss," 346 F. 2d, at 406, and I agree with this rendering which is both sensible and, in my view, obvious. This Court's opinion on the other hand seems to hold that the phrase demands a loss great enough to imperil "sound" corporate operations.[2] That holding, as I shall indicate, is at odds with the Act's wording, has little basis in legitimate statutory history or the aims of the Act, and cannot be sustained by agency or judicial precedent.

Inquiry naturally begins with the language of the Act, and with our reiterated principle that "the words of statutes . . . should be interpreted where possible in their ordinary, everyday senses." *Crane* v. *Commissioner,* 331 U. S. 1, 6; *Malat* v. *Riddell,* 383 U. S. 569, 571. In this instance plainly the normal meaning of "substantial economies" is a significant amount of money and not that amount, whatever its size, which guarantees corporate survival. The first reading would be given by lawyers and laymen alike automatically while the second could hardly be imagined without the prompting of persuasive legislative evidence. If Congress had intended the Court's test to govern, it could easily have said so in

---

can be secured by the retention of control by such holding company of such system;

"(B) All of such additional systems are located in one State, or in adjoining States, or in a contiguous foreign country; and

"(C) The continued combination of such systems under the control of such holding company is not so large (considering the state of the art and the area or region affected) as to impair the advantages of localized management, efficient operation, or the effectiveness of regulation."

[2] I say "seems" to hold both because two statements in the opinion (*ante,* pp. 179, 184–185) emphasize a supposed offsetting economic saving to be found in divestiture and because the SEC has stated the test in this case in varying terms.

shorter space and with far greater precision.[3] In addition, the Court's decision will apparently result in "substantial economies" being read its way in § 11 (b)(1) but in a quite different, more normal fashion where the same phrase appears in § 2 (a)(29)(B), defining an integrated gas utility system (see *ante,* n. 4, of the Court's opinion). None of this is to say that the many subtle choices to be made in deciding what is a substantial sum in the present context are dictated by the terse language of the Act. See *infra,* n. 11. The choice here, however, is between two broad approaches, and the Act's language invites the first and repels the second.

If the natural reading produced some strange or arbitrary result there might be reason to hesitate; but in this case the literal reading makes excellent sense in serving the very rational and desirable end of financial economy. The Congress that passed the Act had been importantly concerned with the "intensification of economic power beyond the point of proved economies . . . ." H. R. Doc. No. 137, 74th Cong., 1st Sess., 4; see §§ 1 (b)(4), (5) of the Act, 15 U. S. C. §§ 79a (b)(4), (5) (1964 ed.) (policy statement), and the Act itself bristles with provisions aimed largely at attaining efficient management and operations. See §§ 7 (d)(3), 10 (c)(2), 12 (d), (f), (g), 13, 15 U. S. C. §§ 79g (d)(3), 79j (c)(2), 79*l* (d), (f), (g), 79m (1964 ed.). With this background, nothing could be more plausible than to curtail divestiture at the point where the prospect of substantial losses removed a prime reason for having divestiture at all. There are to be sure other dangers in proliferated growth besides disecon-

---

[3] This could in fact have been accomplished simply by chopping off the last half of the present, controlling clause (*supra,* n. 1), leaving the condition to read "[e]ach of such additional systems cannot be operated as an independent system" and omitting wholly the qualifying language which begins "without the loss of substantial economies."

omy, dangers which played their part in the passage of the Act, but there are also other clauses of § 11 (b)(1) whose conditions must be met before the exception is allowed (see *supra,* n. 1). In sum, it seems clear enough that the burden of persuasion rests upon those who would displace the Court of Appeals' interpretation.[4]

Legislative history and purpose, heavily relied on by the Court, furnish no reason for departing from the natural reading of the Act. There was very little direct explanation of the "substantial economies" provision in Congress; the majority opinion sets out in full the two important statements, one by the House Conference Committee (*ante,* pp. 180–181) and the other by Senator Wheeler (*ante,* p. 181).[5] The Committee Report, highly authoritative but unilluminating, says merely that there must be "a real economic need" to justify retention of an additional system. Indisputably, substantial savings can be labeled a real economic need, the more so since Congress was sharply concerned with the lack of economic justification for many utility combinations. That the Committee's language is also compatible with the SEC's reading of "substantial economies" does no more than make that language a useless guidepost.

Senator Wheeler's statement, by contrast, does support, if indeed it is not the source of, the SEC interpretation, and normally the view of a principal sponsor of

---

[4] "It . . . [is] wrong to deny the natural meaning of language its proper primacy; like Cardozo's 'Method of Philosophy,' it 'is the heir presumptive. A pretender to the title will have to fight his way.'" Friendly, Mr. Justice Frankfurter and the Reading of Statutes, in Felix Frankfurter: The Judge 40 (1964).

[5] One other legislative comment on the provision favors the Commission, 79 Cong. Rec. 14165–14166 (remarks of Mr. Cooper), but the Court of Appeals properly disregarded it as an opponent's attempt to blacken the Act, cf. *Labor Board* v. *Fruit Packers,* 377 U. S. 58, 66, and the SEC no longer relies upon it in its brief.

an Act carries heavy weight. Here, however, Senator Wheeler made his remarks *after* the bill had finally passed both Houses, and quite arguably "[t]he views of individual members of the legislature as to the meaning of a statute which were not officially communicated to the legislature prior to its enactment are not competent to be considered in determining the meaning which ought to be attributed to the statute." Hart & Sacks, The Legal Process 1285 (tent. ed. 1958, Harvard Univ.). Moreover, in this instance Senator Wheeler had been a fierce opponent of allowing any exception at all to the one-system principle, see 346 F. 2d, at 403, and had excellent reason to minimize severely the scope of the present provision when to do so could no longer cost the Act votes. The SEC itself in its early days, before the elevation of the Wheeler statement to its present exaggerated importance, took a far more guarded view of its worth.[6]

To support its construction of the "substantial economies" provision, the Court also relies on two general policies attributed to the Act as a whole. It is initially emphasized that the Act's overriding aim was to confine holding companies to a single integrated system while control of additional systems was to be "decidedly the exception" (*ante*, p. 180). The mild but misleading inference is that the "exception" is some minor, little noticed addendum, to be strictly construed. In truth, the original, more stringent version of § 11, popularly known as

---

[6] The statement was quoted as cumulative, minor evidence on another matter in 1941, the SEC admitting that it "may not strictly be considered part of the legislative history" but saying it deserved "some consideration." *Engineers Pub. Serv. Co.*, 9 S. E. C. 764, 782–783. In 1942, it was quoted as bearing on the present question but its test was not adopted. *North American Co.*, 11 S. E. C. 194, 209. The following year the statement was thought to reveal "one" of the various criteria to be used along with others. *Cities Serv. Power & Light Co.*, 14 S. E. C. 28, 62.

the "death sentence" provision, was bitterly opposed and the "ABC" clauses exception with Clause A of which we now deal (*supra*, n. 1) was adopted as a considered compromise between quite different House and Senate versions. See Ritchie, Integration of Public Utility Holding Companies 16–19, 151 (1954). The ABC clauses represent part of the price openly paid for enactment, and there is no basis in these events for a grudging interpretation.[7]

Far more weight is given by the Court's opinion to the Act's supposed hostility toward common control of gas and electric utility systems with its danger of stifled competition. First of all, this hostility appears to be an illusion. The House and Senate Committees in identical language expressly stated that common ownership of competing forms of energy was "a field which is essentially a question of State policy"; the present § 8, 15 U. S. C. § 79h (1964 ed.), was enacted to support this approach by using federal power to limit common ownership only where it is contrary to state law. See S. Rep. No. 621, 74th Cong., 1st Sess., 29–30; H. R. Rep. No. 1318, 74th Cong., 1st Sess., 14–15.[8] In its decision in this

---

[7] For its "decidedly the exception" characterization, the Court cites (*ante*, p. 180, n. 9) *North American Co.* v. *SEC*, 327 U. S. 686. That decision imparted no such gloss to the ABC clauses but gave a most cursory summary in passing on the constitutionality of § 11 (b) (1).

[8] The Court's opinion (*ante*, p. 184, n. 14) quotes from p. 7 of the above-cited Senate report, borrowing from it language that suggests § 11 was forwarding the same policy as § 8. What the Court overlooks is that this discussion was directed to an earlier and very different version of § 8, in which it also embodied other restrictions on holding company ownership having nothing to do with common control of gas and electricity but closely related to § 11's policy of federally imposed simplification. A reading of the Court's quotation in context along with the relevant version of S. 2796, 74th Cong., 1st Sess., §§ 8, 11 (as reported on May 13, 1935), will quickly show that its reliance is misplaced. The majority's other citations

very case the SEC stated: "We do not take the view that the Act expresses a federal policy against combined gas and electric operations as such." Holding Company Act Release No. 15035, p. 15. This was apparently so clear at the time the Act passed that in an early and now-repudiated decision the SEC went so far as to hold that gas and electric companies could be combined in the *same* single integrated public utility system. *American Water Works & Elec. Co.*, 2 S. E. C. 972 (1937).

Furthermore, a constricted reading of the "substantial economies" provision is a quite unsuitable way of responding to the dangers in common ownership of competing types of utilities. The provision is equally intended to govern common control of two or more gas systems or two or more electric systems and, at least in the abstract, the Court's reading will hinder those arrangements as well though its rationale is irrelevant to them. If the SEC is prepared to show that freeing a gas system from control by an electric system will improve earnings by some amount, then this may be a legitimate offset to the losses that can be shown, and there is leeway for rough calculations and for estimates based on studying past separations. See Ritchie, Integration of Public Utility Holding Companies 143–147 (1954). But to dispense with proof and disregard the basic test of "substantial economies" is to undo Congress' own careful compromise of the various conflicting policy interests.[9]

in the same footnote are also infirm. The first two citations are statements on behalf of the rule that is now § 8, which allows the States to decide the issue. The remaining citation to the Senate Hearings does indeed reveal one Senator's general concern with common ownership's impact on competition; the respondent states it is "the only such reference in the entire Senate hearing." Brief, p. 37, n. 45.

[9] It should again be remembered also that the present provision is not the only legislative safeguard. Even to obtain ownership over two systems, a holding company must, along with proving "substan-

There remains to be answered only the Court's claim that its reading of the statute is "supported by consistent administrative practice" (*ante,* p. 182, n. 12). Analysis of the SEC decisions shows that the Court is mistaken. The first important construction of "substantial economies" came in *North American Co.,* 11 S. E. C. 194, decided in 1942 only seven years after the Act took effect. Rejecting the assertion that any saving beyond a wholly nominal one would do, the SEC stated: "The normal and usual meaning of the word 'substantial' is a meaning connoting 'important.' And we think that this normal and usual meaning is compelled here." *Id.,* at 209. At least four subsequent decisions cite *North American* and adopt its "importance" test, a natural reading of the Act rather than the unusual and specialized one adopted today. *Cities Serv. Power & Light Co.,* 14 S. E. C. 28, 37 (1943); *Middle West Corp.,* 15 S. E. C. 309, 319 (1944); *Cities Serv. Co.,* 15 S. E. C. 962, 984 (1944); *American Gas & Elec. Co.,* 21 S. E. C. 575, 597 (1945). Also during this first decade of the Act's enforcement two decisions, including one just cited, said that inability to operate independently was "one of the guides which (among others) Congress intended to be used . . . ." *Cities Serv. Power & Light Co.,* 14 S. E. C. 28, 62 (1943); *Commonwealth & Southern Corp.,* 26 S. E. C. 464, 489 (1947). In one other case the SEC stated the loss must be one which would "seriously impair . . . effective operations." *Engineers Pub. Serv. Co.,* 12 S. E. C. 41, 61 (1942).

---

tial economies," show that there is geographical unity and that the combination is not so large as to impair "the advantages of localized management, efficient operation, or the effectiveness of regulation" (*supra,* n. 1). Section 8 (*supra,* p. 190) acts as a further restraint in some cases. Other sections of the Act regulate transactions between utility companies and require disclosure of reports and maintenance of accounting data and other records. §§ 12 (f), 13 (a), 14, 15, 15 U. S. C. §§ 79*l* (f), 79m (a), 79n, 79*o* (1964 ed.).

The majority opinion says that the respondent "concedes" that the Commission has since 1948 articulated its present test, and three SEC decisions are then cited (*ante,* p. 182, n. 12). But with the *Engineers* case just cited as a possible addition, these are the only three decisions until the present one to state the Court's test out of the 15 or more decisions applying § 11 (b)(1), taking the ones already mentioned with those that established no test. Furthermore, the respondent asserts that the three SEC decisions stating its present test involved a very small percentage of the assets it has ordered divested, and even in those three cases it is not clear that the test was determinative. Brief, pp. 47–48. In sum, whether or not the SEC's early decisions may be said actually to refute the test now urged, certainly there is no consistent administrative practice lending it any real weight. Before leaving precedent, it should also be noted that the First and Fifth Circuits have squarely rejected the SEC's present interpretation and that the Second Circuit has approved its "importance" gloss, while only the District of Columbia Circuit has upheld the present reading.[10]

To conclude, I think it should be noted that the Court's departure from the statute is not just an abstract legal error but does immediate, tangible harm in a most practical sense. The annual losses which respondent has forecast for its gas system because of separation exceed

---

[10] The Fifth Circuit case is *Louisiana Pub. Serv. Comm'n* v. *SEC,* 235 F. 2d 167. It was reversed here on jurisdictional grounds, 353 U. S. 368, which does not of course impair its statement on the merits. The Second Circuit decision is *North American Co.* v. *SEC,* 133 F. 2d 148, aff'd on constitutional questions, 327 U. S. 686. The District of Columbia decision is *Philadelphia Co.* v. *SEC,* 85 U. S. App. D. C. 327, 177 F. 2d 720; that court thought it was following its earlier two-to-one decision in *Engineers Pub. Serv. Co.* v. *SEC,* 78 U. S. App. D. C. 199, 138 F. 2d 936, cert. granted, 322 U. S. 723, vacated as moot, 332 U. S. 788, but *Engineers* is ambiguous.

$1,000,000, a figure the SEC has questioned in part but not yet properly considered. The respondent's analysis also shows annual losses of $800,000 for the electrical system, although the SEC deems irrelevant losses to the primary system and the Court of Appeals did not reach this issue. The heavy losses in this case will presumably be borne by investors and consumers if the figures are accurate and separation occurs; it is noteworthy that the Massachusetts Department of Public Utilities appeared at the hearings in this case to oppose divestiture. The SEC has wide latitude in deciding how to gauge and compute "substantial economies" and it has used that freedom in the past.[11] What the Commission has no right to do, however, is to substitute to the detriment of business interests and the public alike a quite different standard for the one enacted by Congress. Neither does this Court have that right. I would affirm the Court of Appeals' well considered decision.

---

[11] Among examples—and I do not mean to approve or disapprove the ones I cite—are SEC rulings that as noted it will not consider losses to the principal system, *General Pub. Utils. Corp.*, 32 S. E. C. 807, 838–839 (1951); that it will not consider tax losses as a very significant factor, *Cities Serv. Co.*, 15 S. E. C. 962, 985 (1944); that it will give only limited weight to capital costs of divestiture, *Eastern Utils. Associates*, 31 S. E. C. 329, 349 (1950); and that it will offset predicted gains resulting from separation against the losses, *North American Co.*, 18 S. E. C. 611 (1945).