413 F.2d 1052
 MUNICIPAL ELECTRIC ASSOCIATION OF MASSACHUSETTS et al., Petitioners,
v.
SECURITIES AND EXCHANGE COMMISSION, Respondent,
Vermont Yankee Nuclear Power Corporation et al., Intervenors.
EASTERN MAINE ELECTRIC COOPERATIVE, INC., Petitioner,
v.
SECURITIES AND EXCHANGE COMMISSION, Respondent,
Maine Yankee Atomic Power Company et al., Intervenors.
 No. 21707.
 No. 21822.
 No. 21927.
 United States Court of Appeals District of Columbia Circuit.
 Argued December 4, 1968.
 Decided March 26, 1969.
 
 Mr. George Spiegel, Washington, D. C., with whom Messrs. Worth Rowley and John C. Scott, Washington, D. C., were on the brief, for petitioners.
 Mr. Philip A. Loomis, Jr., General Counsel, Securities and Exchange Commission, with whom Messrs. David Ferber, Solicitor, Aaron Levy, Associate Director, Division of Corporate Regulation, and Miss Janet G. Gamer, Attorney, Securities and Exchange Commission, were on the brief, for respondent.
 Mr. Warren F. Farr, Boston, Mass., with whom Mr. Jerome Ackerman, Washington, D. C., was on the brief, for intervenors.
 Before FAHY, Senior Circuit Judge, and DANAHER* and McGOWAN, Circuit Judges.
 FAHY, Senior Circuit Judge.
 
 
 1
 These cases, consolidated in this court, involve orders of the Securities and Exchange Commission under the Public Utility Holding Company Act of 1935[1] approving the acquisition by certain New England electric utility companies of the stock of two nuclear-power electric generating companies. Section 9(a) of the Act requires that unless such acquisition has the approval of the Commission under Section 10 of the Act[2] it shall be unlawful for any registered holding company, subsidiary thereof, person or affiliate to engage in any act specified in the section.[3]
 
 
 2
 The nuclear generating companies are Vermont Yankee Nuclear Power Corporation, to be located in Vernon, Vermont, and Maine Yankee Atomic Power Company, to be located near Wiscasset, Maine. The cost of the Vermont plant will be about $120,000,000, and of the Maine plant, $130,000,000 to $140,000,000. Each Yankee is a joint enterprise. Vermont Yankee is sponsored by ten electric utility companies in New England which are to own and operate the plant.[4]
 
 
 3
 Vermont Yankee is expected to produce electric energy at an estimated cost of about 4 mills per kwh, which it is represented would be less than the cost at comparable fossil-fuel plants, and much less than those of Municipals hereinafter referred to.
 
 
 4
 Maine Yankee is sponsored by eleven such New England electric utility companies.[5]
 
 
 5
 Maine Yankee, like Vermont, is expected to produce electric energy at less cost than fossil-fuel plants.
 
 
 6
 The sponsors of each Yankee will be entitled to the total nuclear-generated power of the plant, in quantities proportionate to the stock purchased by each sponsor.[6] The financing of the projects is to be by these purchases of stock supplemented by debt financing. Each of the respective Yankees' principal officers will be an officer of one of the sponsor companies. The power contracts are for long terms of not less than 25 years, and are to be filed with the Federal Power Commission.
 
 
 7
 The power of Vermont Yankee, the Commission found, "will be transmitted from Yankee's plant over the coordinated New England Transmission Grid interconnecting the electric systems of all the sponsor companies." A similar finding was made with respect to Maine Yankee. The state regulatory bodies — Vermont Public Service Board and Massachusetts Department of Public Utilities — have, respectively, approved the issuance of the securities, and each Yankee must be licensed by the Atomic Energy Commission.[7]
 
 
 8
 Municipal Electric Association of Massachusetts, petitioner in this court, is an organization of officials of municipal electric utilities in Massachusetts. It and the cities of Shrewsbury and Wakefield, and the electric utilities of those cities, and of the city of Chicopee, and the Eastern Maine Electric Cooperative, Inc., are now conveniently referred to as Municipals. They were allowed to intervene before the Commission. They sought an evidentiary hearing to support their position that approval of the acquisitions of the stock by applicants, to the exclusion of opportunity to Municipals to obtain access to any of the power directly from Yankees, was not in the public or consumer interest. Special reliance was placed by Municipals upon the requirements of Section 10(b) (1) of the Act, note 2, supra.
 
 
 9
 The Commission denied Municipals' request for an evidentiary hearing, deeming Municipals presented no issue of fact relevant to the proceedings. The Commission concluded that no findings adverse to approval were required under Section 10(b) (1). It viewed Municipals' position as a request that approval of the acquisitions be conditioned so as to permit Municipals an opportunity to obtain directly some of the power of Yankees and held this was not necessary in the public interest.
 
 
 10
 Municipals petition this court for review under Section 24(a) of the Act, 15 U.S.C. § 79x(a). While Municipals suggest that in the absence of the conditions they seek the acquisitions should not be approved, their basic position, as the Commission noted, is that the acquisitions should be approved in a manner which would give Municipals an opportunity on reasonable terms to obtain access to this new lower-cost power. They contend for this on the basis primarily of the competitive considerations involved in the ultimate issue of the public and consumer interests, synthesized in Section 10(b) (1) of the Act interpreted in light of the public policy represented by the federal antitrust laws.
 
 
 11
 This is the crux of the case, for if we lay aside the problem arising from Section 10(b) (1), the findings and conclusions of the Commission are well supported. These include findings (1) requisite to exemption under Section 6(b) from requirements of Section 6(a) of the Act that the issue and sale be solely to finance the business and are authorized by the State Commissions; (2) pursuant to Rule 50(a) (5) promulgated under the Act respecting the inappropriateness of competitive bidding; (3) under Section 10(b) (2) and (3) respecting the fairness and reasonableness of the consideration, or that the acquisitions will not be detrimental to the public interest or the interest of investors or consumers; (4) under Section 10(c) (2) that the acquisition will serve the public interest by tending towards the economical and efficient development of an integrated public utility system. The following additional findings of the Commission, phrased here in reference to Vermont Yankee, which we accept, are also helpful in placing the problem in its proper setting:
 
 
 12
 Yankee will function only as a generating company which will sell power to its sponsors in proportion to their respective stock ownership. The large size and the proven design of the plant are expected to result in generating costs lower than those of conventional steam electric plants in the New England area. The sponsor companies are already interconnected and coordinated in their operations through the New England transmission grid. The present transmission facilities, plus the planned additions to the grid, which will increase its capacity and connect Yankee to the grid, will be adequate to assure each sponsor company the equivalent of its entitlement to power generated at the plant at economical transmission costs. Each sponsor will be able to absorb and integrate its share of Yankee's power output into its own load requirements. In view of the existing state of the art of generation and transmission and the economic advantages of the proposed arrangements, Yankee may be deemed to be within the same area or region as each sponsor applicant, and there does not appear to be any impairment to the effectiveness of regulation or the advantages of localized management.
 
 
 13
 We come now more directly to Section 10(b) (1). The Commission stated its position as follows:
 
 
 14
 We have considered the applicability of Section 10(b) (1) in prior situations involving the joint ownership of a nuclear generating plant by two or more holding companies. We concluded that such arrangements do not create a relationship detrimental to the public interest or the interest of investors or consumers where, as here, the sponsoring companies do not acquire any control over each other by virtue of the proposed transactions, and the limited interlocking relations and arrangements embraced by the project are the normal requirements of a joint operation by the sponsoring companies to secure the advantages of large-scale generation to meet their power needs.[6]
 
 
 15
 6. Yankee Atomic Electic Company, 36 S.E.C. 552, 562 (1955); Connecticut Yankee Atomic Power Commission, 41 S.E.C. 705, 709 (1963). See also Electric Energy, Inc., 38 S.E.C. 658, 665 (1958).
 
 
 16
 Under the circumstances we do not consider the ownership of Yankee and the related arrangements as having the consequences proscribed by Section 10 (b) (1). As noted no sponsor will acquire any control over any other sponsor by virtue of the proposed transactions, and each sponsor will be free, insofar as the other sponsors are concerned, to use or resell its share of the Yankee power output.
 
 
 17
 The Commission also stated that approval would not involve any competitive consequences of a nature to require adverse action in the public interest, and concluded its opinion as follows:
 
 
 18
 [W]e conclude that no adverse findings are required under Section 10(b) (1) of the Holding Company Act and that it is not necessary or appropriate in the public interest to impose the conditions requested by Intervenors. We shall also deny Intervenors' request for an evidentiary hearing, since no issue of fact relevant to this proceeding has been presented by the Intervenors.
 
 
 19
 Although the Commission explicitly recognized that consideration of anti-competitive consequences was a factor relevant to the statutory standard of public interest, it appears to have approached this factor by interpreting Section 10(b) (1) in light of the economic evils and types of control which gave rise to the legislation Congress passed in 1935. For this restrictive view of Section 10(b) (1) the Commission relied in part upon the legislative evolution of the language "concentration of control of public-utility companies" in that section. Perhaps this choice of language by Congress justifies the Commission in not feeling as free as it otherwise might in giving weight to the federal anti-trust policies.[8] Nevertheless Section 10(b) (1) must take significant content from those policies. In a case involving Section 11(b) (1) of the Act, in considering the effect of the terms of Section 1(b) that when subsidiary public-utility companies entered into transactions in which evils result from "restraint of free and independent competition," the Supreme Court stated that the theme of elimination of such restraint "runs throughout the Act." S.E.C. v. New England Electric System, 384 U.S. 176, 183, 86 S.Ct. 1397, 16 L.Ed.2d 456; and in California v. F.P.C., 369 U.S. 482, 484-485, 82 S.Ct. 901, 8 L.Ed.2d 54, in passing upon the validity of merger transactions under Section 7 of the Natural Gas Act,[9] the Court stated that evidence of anti-trust violations is plainly relevant because part of the content of "public convenience and necessity," terms used in that section, is found in the laws of the United States. By like reasoning violations of the antitrust laws bear upon "the public interest or the interest of investors or consumers," terms used in Section 10(b) (1) of the Act now before us. And see the extensive review of the over-all problem in Northern Natural Gas Co. v. F.P.C., 130 U.S.App.D.C. 220, 399 F.2d 953. We note also that Section 7 of the Clayton Act[10] provides that nothing therein shall apply to transactions consummated pursuant to authority given by the Securities and Exchange Commission in the exercise of its jurisdiction under Section 10 of the Public Utility Holding Company Act. This is indicative of a congressional intent that the Commission take into account the policies underlying the Clayton Act in deciding whether to approve a stock acquisition.
 
 
 20
 Though the purpose of Congress was to remedy economic evils inherent in the control of utilities by holding companies, the terms of Section 10(b) (1) do not by definition limit the prohibited control to a particular method. The assertions of Municipals as to which they seek an evidentiary hearing point to an increasing concentration in Massachusetts and, indeed, in New England, of control over low cost electric power through nuclear generating plants. Municipals are excluded from the opportunity to have access on reasonable terms to this power at its source, where it is available solely to the sponsoring companies. Municipals assert that this is due to an intentional course of conduct designed to increase the control of sponsors over the industry in the area and to foreclose opportunities to Municipals. While the areas respectively served by Municipals and the sponsors do not territorially overlap, and are regulated by local agencies, sponsors or their affiliates compete with Municipals to supply power for new enterprises coming into the areas. Moreover, Municipals charge before the Commission in more or less classical antitrust terms that applicants have participated in combinations or conspiracies by which Municipals have been excluded from participation in regional planning of bulk generation and transmission and believe that the present projects emerged from such regional planning activities. This aside, and perhaps closer to the issue of actual concentration of control, are Municipals' representations that sponsors, in combination with others, are obtaining a monopoly in New England over electric generation through systematic exclusion of Municipals and other small electric distributors from "participating in or purchase of power from" nuclear generators in New England, and that sponsors are believed to be working together to prevent Municipals from obtaining any form of low cost bulk power and to keep them in the status of customers purchasing at the higher rates of the operations of most of the applicants. A number of municipal utilities, including the Shrewsbury Electric Light Plant, purchase their power supply from one of the applicants which will acquire the stock of Yankees and by such acquisition become exclusively entitled to contract for a pro-rata share of the plants' outputs, or from companies which are interconnected with and purchase electricity from sponsors of Yankees. It is represented that petitioner Town of Wakefield, Massachusetts, operates the Wakefield Municipal Light Department which serves some 8400 customers and purchases all of its energy from Boston Edison Company. Boston Edison is interconnected with New England Power Company and will transmit Yankee power over its lines. Wakefield seeks an opportunity to purchase Maine Yankee bulk power and to obtain related transmission service.
 
 
 21
 It is represented that the Power Planning Committee of the Municipal Electric Association of Massachusetts has responsibility for seeking out and negotiating for low-cost bulk-power supplies and transmission services, subject to acceptance by individual Massachusetts municipal utilities; that the Association is seeking to obtain reasonable opportunities for Municipals to purchase power, and stock if necessary, from Yankees on the same or economically equivalent basis as power is to be sold to the sponsors of Yankees. This is represented to be part of the Planning Committee's effort to assemble a total low-cost power supply for municipal utilities.
 
 
 22
 Municipals represent[11] that in Massachusetts they serve about 11 percent of the customers in the State. They also represent that about 80 percent of their requirements are purchased from investor-owned branches of the industry, and that their purchase prices average 11.5 to 15.1 mills per kwh as compared to the national average of 4.9 mills per kwh for wholesale supply to municipals — an above-average cost of some $10,000,000 per year. They also represent that wholesale rates in Massachusetts are thus more than double the national average. Four of the five large investor-owned electric utility systems in Massachusetts are sponsors of Yankees, and the fifth was among the sponsors of earlier nuclear generating projects. Western Massachusetts Electric Company, a subsidiary of Northeast Utilities, covers a large part of western Massachusetts; and Northeast is supplied by New England Power Company, a subsidiary of the New England Electric System, the largest electric utility in Massachusetts. In the map referred to private and municipal systems are shown to be meshed in here and there in various parts of the state.
 
 
 23
 In addition to the competition in Massachusetts among utilities, public and private, to attract new commercial and industrial business into their respective service areas, Municipals represent that yardstick competition also exists between them and private utilities, "and the ability of the municipal utilities generally to charge residential rates lower than those of the private investor utilities has had a moderating effect upon the latter's rates."
 
 
 24
 It is our view that if factually the foregoing representations are substantially correct the plans of sponsors, with the strong economic position they would attain by entitlement to all the new low cost power involved, tend toward a concentration of control of public utility companies. This occurs by the limitations the plans make possible and perhaps probable upon the ability of Municipals to maintain a healthy economic life in the industry. This type of control, albeit indirect in the sense of not constituting control by internal company voting or managerial authority, does not seem to the court to be beyond the reach of the language of Section 10(b) (1); and if within the language we think the Commission has jurisdiction to consider such control; for it is not inconsistent with the purposes of the Act. These purposes do not argue for a narrow construction of Section 10(b) (1). As Commissioner Smith said in his dissenting opinion:
 
 
 25
 That an industry development of the importance and probable impact of these nuclear generating plants, and the high capacity transmission facilities which make distribution of their output feasible, was not foreseen when the Act was written should not justify a static historical reading of its provisions.
 
 
 26
 Moreover, in considering the issue of control, we bear in mind that the plan of the sponsors as it affects Municipals is part of the capital structure of Yankees. The acquisition of the stock carries with it the acquisition of all the low cost power, to the exclusion of Municipals. The control challenged by Municipals is tied in significant manner to the acquisition of the stock, accompanied too by an arrangement for interlocking officers.
 
 
 27
 To pursue the matter further, we think the Commission was not justified in ruling that the absence of control of any sponsor over any other sponsor made Municipals' challenge irrelevant and, therefore, not the basis for a hearing to enable Municipals to establish, if they could, the type of control, and its tendencies and consequences, which they assert. Should such control be established Commission consideration of it would be required in deciding whether it was "of a kind or to an extent detrimental to the public interest or the interest of investors or consumers." Approval of the stock acquisitions would depend upon the outcome of a weighing of such control with any factors which favor the projects in the particular terms proposed by applicants. An element to be considered would be Municipals' claim of right, in the interest of the public and consumers, to an opportunity to obtain Yankees' power at its source. They contend that such a right, on reasonable terms, even to the purchase of stock if necessary, is relevant to the question whether the control they assert, should it be found, is detrimental to those interests, absent the right. The weakness of their position is in the fact that should such opportunity be afforded to Municipals it is not certain that any significant number of the organizations comprising Municipals would be able or willing to meet reasonable terms for such access. Yet the opportunity to do so bears upon the economic equity of the projects in relation to the public and consumer interests. If the utilities comprising Municipals cannot in any significant number meet the terms, the actual concentration of control would not be significantly diluted, but the issue of opportunity to obtain the low cost power on reasonable terms in this manner bears upon the issue of control in a respect which is relevant to the public and consumer interests.
 
 
 28
 The Commission contends that it is without authority to condition approval of the stock purchases by sponsors so as to enable Municipals to have the opportunity they seek; and the Commission points out that, insofar as consumers are concerned, appropriate state commissions have approved the proposed acquisitions and, also, that the Federal Power Commission has regulatory jurisdiction over Yankees. Thus, the Commission states:
 
 
 29
 Issues with respect to wholesale supply of power, applicable rates, and charges of discrimination thereunder, are subject to regulation and review by the FPC, so that Intervenors may present any complaints they might have in these respects to that agency.
 
 And further:
 
 30
 The conditions requested by Intervenors call in effect for the allocation of bulk power and the fixing of costs for the purchase and transmission of such power, matters which are not within the scope of our jurisdiction but rather relate to areas entrusted to other regulatory agencies. [Citing Alabama Electric Cooperative v. S.E.C., 122 U.S.App.D.C. 367, 353 F.2d 905 (1965), cert. denied, 383 U.S. 968, 86 S.Ct. 1273, 16 L.Ed.2d 309 (1966); see also Alabama Electric Cooperative, Inc. v. S.E.C., 359 F.2d 434 (C.A. 5, 1966).][12]
 
 
 31
 Since for the reasons we have given the hearing Municipals seek would in our opinion concern itself with relevant considerations, and might lead the Commission to decide that without conditions Section 10(b) (1) would not be satisfied, but might be with conditions, we think the Commission has authority to impose them. The arrangement by which sponsors control at the source the entire electric power generated by Yankees is itself an allocation of power by private enterprise. Such allocation would be given public sanction by Commission approval of the acquisitions. Any reallocation which would result from the suggested conditions would not invade the jurisdiction of the Federal Power Commission. It would be an exercise by the Commission of its own authority under Section 10(e) of the Act, considered with Section 10(b) (1). Section 10(e) reads:
 
 
 32
 (e) The Commission, in any order approving the acquisition of securities or utility assets, may prescribe such terms and conditions in respect of such acquisition, including the price to be paid for such securities or utility assets, as the Commission may find necessary or appropriate in the public interest or for the protection of investors or consumers.
 
 
 33
 15 U.S.C. § 79j(e).
 
 
 34
 The plans of Yankees tie to the acquisition of the stock an allocation of power which in the end absorbs all the power. This as we have said is part of sponsors' capital structure. It would seem clear therefore that Section 10(e) permits conditions to be required by the Commission to the acquisition of such stock.
 
 
 35
 Our position is not inconsistent with Alabama Electric Cooperative, Inc. v. S.E.C., 122 U.S.App.D.C. 367, 353 F.2d 905, cert. denied, 383 U.S. 968, 86 S.Ct. 1273, 16 L.Ed.2d 309, relied upon by the Commission. The issue there was whether the issuance and purchase of the stock should be exempted from the provisions of Section 6(a) unless under Section 6(b) the authorization was conditioned by a requirement which would prevent use of any part of the proceeds of the sale of the stock to duplicate the Cooperative's lines or other facilities. The stock issue and sale, the Commission had said, "are solely for the purpose of financing the business of Alabama Power and have been expressly authorized by the Public Service Commission of Alabama,[4] * * *." 122 U.S.App.D.C. at 368, 353 F.2d at 906. Thus the Court in rejecting Cooperatives' position held:
 
 
 36
 The purpose of the Public Utility Holding Company Act, as shown by its legislative history, was to supplement state regulation — not to supplant it. Nowhere in the Act is there a provision granting to the SEC the sort of regulatory power attributed to it by the petitioner. Indeed, the congressional choice of that Commission to administer the Act is, in itself, the strongest sort of proof that the general purpose of the Act was to regulate the issuance of securities which could not be reached by state commissions.
 
 
 37
 122 U.S.App.D.C. at 369, 353 F.2d at 907.
 
 
 38
 The line between the Alabama case and this, though deemed thin, we think is distinct. There a condition was sought to govern the use of funds realized by sale of the stock after it was to be issued in terms which themselves were not questioned. Here the conditions sought are claimed to be necessary to the validity under Section 10(b) (1) of the original acquisitions of the stock. Such conditions are not barred from consideration by the Commission if deemed essential, or even advisable, to bring these important projects, with their many advantages, into better status under the standards of Section 10(b) (1) of the Act. Those standards warn against a tendency toward interlocking relations or concentration of control of public utility companies of a kind and to an extent detrimental to public or consumer interest, or both.
 
 
 39
 The orders in suit are set aside and the cases are remanded for a hearing and reconsideration to enable the Commission to conform with this opinion, including an evidentiary hearing if necessary.
 
 
 
 Notes:
 
 
 *
 Circuit Judge Danaher became Senior Circuit Judge on January 23, 1969
 
 
 [1]
 15 U.S.C. § 79et seq.
 
 
 [2]
 Other requirements of the Act being met Section 10(b)(1) provides for approval of the acquisition unless the Commission finds that —
 such acquisition will tend towards interlocking relations or the concentration of control of public-utility companies, of a kind or to an extent detrimental to the public interest or the interest of investors or consumers.
 15 U.S.C. § 79j(b) (1).
 
 
 [3]
 The full text of Section 9(a) is as follows:
 (a) Unless the acquisition has been approved by the Commission under section 79j [Section 10] of this title, it shall be unlawful —
 (1) for any registered holding company or any subsidiary company thereof, by use of the mails or any means or instrumentality of interstate commerce, or otherwise, to acquire, directly or indirectly, any securities or utility assets or any other interest in any business;
 (2) for any person, by use of the mails or any means or instrumentality of interstate commerce, to acquire, directly or indirectly, any security of any public-utility company, if such person is an affiliate under clause (A) of paragraph (11) of subsection (a) of section 79b [Section 2] of this title, of such company and of any other public utility or holding company, or will by virtue of such acquisition become such an affiliate.
 15 U.S.C. § 79i(a).
 An exemption by Commission order pursuant to § 6(b) of the Act, 15 U.S.C. § 79f(b), is also required (when the acquisition is approved) because by sale of the stock the generating companies become subsidiaries of registered holding companies.
 
 
 [4]
 The sponsors of Vermont Yankee, of which the seven first listed are applicants before the Commission, are the following:
 
 
 [1]
 New England Power Company (NEPCO)
 
 
 [2]
 The Connecticut Light & Power Company (CL&P)
 
 
 [3]
 The Hartford Electric Light Company (Hartford)
 
 
 [4]
 Western Massachusetts Electric Company (WMECO)
 
 
 [5]
 Montaup Electric Company (Montaup)
 
 
 [6]
 Central Vermont Public Service Corporation (Central Vermont)
 
 
 [7]
 Green Mountain Power Corporation (Green Mountain)
 
 
 [8]
 Cambridge Electric Light Company (Cambridge)
 
 
 [9]
 Public Service Company of New Hampshire (PSNH)
 
 
 [10]
 Central Maine Power Company (Central Maine)
 Approval by the Commission of the acquisition is required, see Section 9(a), note 3, supra, because NEPCO, CL&P, Hartford, WMECO and Montaup are subsidiaries of registered holding companies; and Central Vermont, Green Mountain, NEPCO and CL&P are, or by such acquisition would become, affiliates of Vermont Yankee and another public service utility or holding company.
 
 
 [5]
 The sponsors of Maine Yankee, of which the eight first listed are applicants before the Commission, are the following:
 
 
 [1]
 New England Power Company (NEPCO)
 
 
 [2]
 The Connecticut Light & Power Company (CL&P)
 
 
 [3]
 The Hartford Electric Light Company (Hartford)
 
 
 [4]
 Western Massachusetts Electric Company (WMECO)
 
 
 [5]
 Montaup Electric Company (Montaup)
 
 
 [6]
 Maine Public Service Company (Maine Public Service)
 
 
 [7]
 Public Service Company of New Hampshire (PSNH)
 
 
 [8]
 Central Maine Power Company (Central Maine)
 
 
 [9]
 Cambridge Electric Light Company (Cambridge)
 
 
 [10]
 Central Vermont Public Service Corporation (Central Vermont)
 
 
 [11]
 Bangor Hydro-Electric Company (Bangor)
 Approval by the Commission of the acquisition is required, see Section 9(a), note 3, supra, because NEPCO, CL&P, Hartford, WMECO and Montaup are subsidiaries of registered holding companies; and Maine Public Service, PSNH, Central Maine, NEPCO and CL&P are, or by such acquisition would become, affiliates of Maine Yankee and another public service utility or holding company.
 
 
 [6]
 The percentages of stock and power entitlement of the various sponsor companies are as follows:
 Vermont Yankee Percentage Maine Yankee Percentage
 _______________________________ ________________________________
 Central Vermont 35.0 Central Maine 38.0
 Green Mountain 20.0 NEPCO 20.0
 NEPCO 20.0 CL&P 8.0
 CL&P 6.0 Bangor 7.0
 Central Maine 4.0 Maine Public Service 5.0
 PSNH 4.0 PSNH 5.0
 Hartford 3.5 Hartford 4.0
 Cambridge 2.5 Cambridge 4.0
 Montaup 2.5 Montaup 4.0
 WMECO 2.5 WMECO 3.0
 Central Vermont 2.0
 ______ _______
 100.0% 100.0%
 ====== =======
 
 
 [7]
 The Atomic Energy Commission's grant of a research and development license to Vermont Yankee is pending review in this court. Power Planning Committee of the Municipal Electric Association of Massachusetts et al. v. A.E.C., No. 21844
 
 
 [8]
 Section 10(b) (1) had its genesis in the Report of the National Power Policy Committee forwarded by the President to the Congress. H.R.Doc.No. 137, 74th Cong., 1st Sess. (1935); S.Rep.No. 621, 74th Cong., 1st Sess. (1935). One of the Policy Committee recommendations, adopted in the initial bills, was that the Commission should have the power to prevent acquisitions that would "tend to create monopoly or restraint of trade in the exercise of control of public-utility companies." See Section 9(b) (1) of H. R. 5423, 74th Cong., 1st Sess. (1935) and Section 10(b)(1) of S. 1725, 74th Cong., 1st Sess. (1935). During the hearings this provision was modified and, as enacted, Section 10(b) (1) was altered to read as it does nowSee note 2, supra.
 
 
 [9]
 15 U.S.C. § 717f
 
 
 [10]
 15 U.S.C. § 18
 
 
 [11]
 Appendix B to their brief in this court, which is a map of electric company service areas. The map is attributed to the Department of Commerce and Development of Massachusetts
 
 
 [12]
 In the end the Commission seems not to have placed its denial of the conditions upon lack of authority under Section 10(b) (1), but having decided that that section was complied with without such conditions it was not necessary or appropriate to impose them